Stacy E. WOLF, a minor by her Guardian
ad litems Leroy A. WOLF and Doris
E. Wolf, Individually, Plaintiffs,

v.

The PROCTER & GAMBLE COMPANY
and the Procter & Gamble Distributing
Company, Defendants.

No. 82–130.

United States District Court,
D. New Jersey,
Civil Division.

Dec. 22, 1982.

Emil S. Cuccio (argued), Jones & Cuccio, Hackensack, N.J., Paul F. Bennett, David B. Gold, P.C., San Francisco, Cal., for plaintiffs.

Thomas F. Campion, Shanley & Fisher, Newark, N.J., Thomas S. Calder (argued), Dinsmore & Shohl, Cincinnati, Ohio, for defendants.

## OPINION

CLARKSON S. FISHER, Chief Judge.

This is an action by plaintiffs Stacy Wolf, Doris E. Wolf, and Leroy A. Wolf against defendants the Procter & Gamble Company and the Procter & Gamble Distributing Company, (hereinafter "Procter & Gamble"). Plaintiffs allege that in March, 1980, Stacy Wolf contracted Toxic Shock Syndrome (hereinafter "TSS") as a result of using Rely tampons, a product manufactured and distributed by defendants. Plaintiffs' complaint asserts negligence, strict products liability, breach of express and implied warranty and reckless misrepresentation. They seek both compensatory and punitive damages.

Presently before the Court are eight (8) *in limine* motions brought by plaintiffs and defendants and a motion to intervene brought by 20 plaintiffs in other Rely tampon actions. All motions are opposed except for plaintiffs' motion to exclude reference to other pending Rely tampon actions as a ground for mitigation of punitive damages. Defendants have advised the Court that they do not intend to introduce such evidence during this trial. I will therefore assume that defendants do not oppose this motion and it is granted.

### I. *State of the Art Defense*

Plaintiffs seek to prevent defendants' introduction of evidence (1) that safe-

ty testing of Rely prior to marketing conformed to government regulations and industry standards; (2) that defendants did not know of the defective nature of Rely during its development and marketing; (3) that without such knowledge, defendants had no duty to warn of the product's dangerous propensities; (4) that Stacy Wolf's injury resulted from an idiosyncratic physical condition not foreseeable to defendants and (5) that the alleged low incidence rate of TSS obviated defendants' duty to warn.

Plaintiffs argue that the New Jersey Supreme Court's recent rulings in *Freund v. Cellofilm Properties, Inc.*, 87 N.J. 229, 432 A.2d 925 (1981) and *Beshada v. Johns-Manville Products Corp.*, 90 N.J. 191, 447 A.2d 539 (1982) have eliminated defenses to which such evidence would be relevant.

In *Freund, supra* at 237–241, 447 A.2d 539, the Court examined the difference between negligence and strict liability theories in the context of an inadequate warning issue. It concluded that whereas the negligence approach is conduct-oriented and looks to the issue of the reasonableness of the manufacturer's actions, the strict liability approach is product-oriented and looks to the dangerousness of the product. Under the latter approach, knowledge of the inherent danger of the product is imputed to the manufacturer and the question of what it knew or should have known is irrelevant. *Id.* The Court held that in an inadequate warning design defect case, a strict liability charge should be given and that the charge:

> Must focus on safety and emphasize that a manufacturer, in marketing a product with an inadequate warning as to its dangers, has not satisfied its duty to warn, even if the product is perfectly inspected, designed, and manufactured. Moreover, and importantly, the charge must make clear that knowledge of the dangerous trait of the product is imputed to the manufacturer. It must also include the notion that the warning be sufficient to adequately protect any and all foreseeable users from hidden dangers presented by the product. This duty must be said to attach without regard to

prevailing industry standards. 87 N.J. at 242–43, 432 A.2d 925.

*Freund* does not stand for the proposition that evidence such as that which plaintiff seeks to have excluded is irrelevant and inadmissible where, as here, the manufacturer's negligence is also at issue. Rather, the Court recognized that while the defendant's knowledge may be presumed for purposes of determining strict liability, "[i]n negligence cases, such knowledge must be proved." *Id.* at 239, 432 A.2d 925.

In *Beshada, supra*, the Court once again looked at a strict liability case dealing with failure to warn. There it dealt with the issue of the allowability of the state-of-the-art defense, which conditions products liability on whether the product's dangers were scientifically discoverable at the time it was marketed. *Id.* at 202, 447 A.2d 539. It held that in a strict liability failure to warn case, such a defense would not be allowed as the manufacturer's knowledge and fault are not relevant. However the Court did not rule out the use of the state-of-the-art defense where the manufacturer's negligence is at issue. To the contrary, the Court said "state-of-the-art is a negligence defense. It seeks to explain why defendants are not culpable for failing to provide a warning." *Id.* at 204, 447 A.2d 539.

In the present case, defendants' conduct is very much at issue. Although Count I is based upon strict liability in tort, there is also a count of negligence and one of intentional, knowing, or reckless misrepresentation. Plaintiffs seek not only compensatory damages, but punitive damages as well. Defendants should not be precluded from introducing evidence relevant to the reasonableness of their behavior. A strict liability jury charge as contemplated by the New Jersey Supreme Court in *Freund, supra,* will prevent the plaintiffs from being unduly prejudiced by this evidence.

Plaintiffs' motion to exclude evidence pertaining to the state-of-the-art defense is denied.

## II. *Punitive Damages*

Defendants have moved to strike plaintiffs' claim for punitive damages or in the alternative to exclude reference to punitive damages during voir dire and opening statements and to exclude evidence of defendants' finances until plaintiffs establish a *prima facie* showing of entitlement to punitive damages.

The motion to strike the punitive damages claim is essentially one for partial summary judgment. Where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law, summary judgment is appropriate. Fed.R.Civ.P. 56(c).

■ Defendants contend that the claim for punitive damages is inconsistent with a claim for compensatory damages under strict liability. They refer us to a recent, well reasoned decision in this district where Judge Ackerman, examining New Jersey law, determined that a New Jersey court, as a matter of law, would not allow punitive damages to be awarded in an action based upon strict liability. *Gold v. Johns-Manville Sales Corp.*, 553 F.Supp. 482, (D.N.J.1982). He based this prediction upon the New Jersey Supreme Court's decision in *Beshada, supra,* reasoning that a claim for punitive damages, which, like state-of-the-art defense is based upon defendant's knowledge, is a based upon defendant's knowledge, is a negligence concept and focuses upon the reasonableness of defendant's behavior rather than upon whether the product was reasonably safe. However, the Judge, noting that plaintiffs still intended to assert claims based upon negligence, refused to strike the claims for punitive damages. *Id.,* Tr. 31:8–13. Since, in the case here, plaintiffs still intend to assert claims based upon negligence and intentional, knowing and reckless misrepresentation, we cannot strike plaintiffs' claim for punitive damages as a matter of law.[1]

■ Defendants argue that plaintiffs will be unable to meet the high burden of proof necessary to establish entitlement to punitive damages and are unlikely to prevail on this issue. However the likelihood of plaintiffs' prevailing is not the appropriate standard to be applied in determining whether to dismiss this claim. Summary judgment is only appropriate if, taking plaintiffs' allegations as true and drawing all inferences in their favor, we are convinced from our review of the evidential sources available that there is no genuine issue of material fact. *Scott v. Plante,* 532 F.2d 939, 945 (3d Cir.1976).

■ Punitive damages may be awarded where defendant's conduct is "especially egregious." *Leimgruber v. Claridge Associates, Ltd.,* 73 N.J. 450, 454, 375 A.2d 652 (1977). Such conduct must be actuated by intentional wrongdoing or accompanied by wanton and wilful disregard of the rights of another. *DiGiovanni v. Pessel,* 55 N.J. 188, 191, 260 A.2d 510 (1970).

Defendants claim that they have acted with the utmost of responsibility and concern for the health and safety of Rely users and that plaintiffs will be unable to meet the heavy burden of proof required for an award of punitive damages. As support for this contention they allege that they thoroughly tested Rely, both prior to marketing it and continually during its lifetime; that at the time of Stacy Wolf's illness, the possible association between TSS and Rely or any other tampon was unknown; that they voluntarily withdrew Rely from the market at the first indication of a statistical correlation between it and TSS; and that they are presently funding, through unrestricted grants, TSS research. They argue that because of these facts, plaintiffs will be unable to demonstrate that defendants knew or should have known of a substantial risk of injury from Rely and that they acted with reckless disregard of the consequences or that they otherwise acted intentionally or with wanton and reckless disregard of plaintiffs' rights.

---

1. Should the jury find for plaintiffs on the issue of strict products liability only, then we are in accord with Judge Ackerman's opinion that an award of punitive damages will not be allowed.

Plaintiffs contend that admissible evidence will show that defendants did not conduct basic microbiological tests prior to marketing Rely, which tests would have uncovered the dangers inherent in its use, and that defendants failed to notify the FDA of a change in a component of Rely in order to avoid having the product retested for premarket approval, which retesting might have uncovered its defects. Plaintiff's further claim that evidence will show that defendants' marketing and promotion of Rely as having been thoroughly tested and proven safe for use constituted wanton and reckless disregard for plaintiffs' rights and safety.

It appears from the foregoing that a genuine issue of material fact exists as to whether defendants' actions constituted wanton and reckless disregard for plaintiffs' rights and safety. Defendants' motion to dismiss plaintiffs' claim for punitive damages is therefore denied.

Defendants seek to preclude plaintiffs from referring to punitive damages during voir dire and opening statements. They also seek to exclude evidence of Procter & Gamble's finances and expenditures on Rely until a *prima facie* case for punitive damages has been established. Defendants contend that premature mention of punitive damages will unfairly prejudice them and that financial information is not only prejudicial but irrelevant unless and until a *prima facie* showing of entitlement to punitive damages is established.

Plaintiffs argue that a rule that would exclude reference to an element of a case before a *prima facie* showing is made of its existence, would do away with opening statements. In addition they argue that financial information is relevant not only to the issue of punitive damages but also to the issue of defendants' negligence, i.e., whether defendants acted reasonably in failing to conduct certain tests.

The purpose of voir dire is to enable the trial judge and counsel to determine whether a prospective juror is biased. *Photostat Corp. v. Ball,* 338 F.2d 783, 786 (10th Cir.1964). Any potential abuse of the voir dire process is eliminated in this district by the fact that the trial judge conducts the voir dire examination. I fail to see the need to rule now on the question of whether to allow reference to punitive damages during voir dire. That determination can be made by the trial judge when proposed voir dire questions are submitted by counsel.

The purpose of an opening statement is to inform the jurors of the nature of the action, the issues and the questions of fact involved in order to facilitate their understanding of the evidence to be presented. *Shafer v. H.B. Thomas Co.,* 53 N.J.Super. 19, 26, 146 A.2d 483 (App.Div. 1958), 75 Am.Jur.2d *Trial* § 125 (1974). Plaintiffs have alleged and have offered to prove that defendants acted with wanton and reckless disregard of the rights and safety of plaintiffs. They should be allowed, in their opening statement, to advise the jury of the issues and questions of fact they intend to raise so that the jurors will be better able to understand the evidence.

Defendants also seek to exclude evidence of Procter & Gamble's finances until a *prima facie* case for punitive damages is established. It is well settled that such evidence is admissible in a case where punitive damages are recoverable. *Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 270, 101 S.Ct. 2748, 2761, 69 L.Ed.2d 616 (1981), *Herman v. Hess Oil Virgin Islands Corp.,* 524 F.2d 767, 772 (3d Cir.1975).

As previously stated, plaintiffs propose to introduce evidence that will raise a genuine factual issue as to whether defendants' conduct warrants an award of punitive damages. When they do, evidence of Procter & Gamble's financial condition will be relevant and admissible. Pursuant to Fed.R.Evid. 104(b),[2] the Court will admit

---

2. Fed.R.Evid. 104(b) provides that:
 When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition.

**620**

such evidence upon a finding that plaintiffs have established a prima facie case of entitlement to punitive damages. However, the decision as to evidence of Procter & Gamble's financial condition does not apply to evidence of its expenditure for the development and marketing of Rely, which evidence may be relevant to the reasonableness of defendants' actions.

For the above reasons, defendants' motion to exclude reference to punitive damages during voir dire and opening statements is denied but their motion to exclude evidence of Procter & Gamble's financial condition until plaintiffs establish a *prima facie* showing of entitlement to punitive damages is granted.

### III. *Other TSS Occurrences*

Defendants have moved to exclude evidence of occurrences of TSS other than those of Stacy Wolf. The nature of the evidence sought to be introduced is not clear from the papers submitted although both parties refer in their briefs to consumer complaints received by Procter & Gamble by mail and by telephone. In addition, plaintiffs have referred in their brief to certain records of the Centers for Disease Control (hereinafter "CDC").

Plaintiffs contend that evidence of other injuries and deaths from TSS by users of Rely is relevant to the issue of the unreasonableness of the danger of Rely and also to the issue of proximate cause.

Assuming arguendo that the consumer complaints are relevant to the above issues and that their probative value substantially outweighs the dangers of unfair prejudice and confusion of the issues and the consideration of waste of time, they nevertheless are inadmissible hearsay.

The evidence of consumer complaints consists of complaints made over the telephone and incorporated into a written record by employees of Procter & Gamble and complaints contained in letters to the company. Even if the records made by Procter & Gamble employees are admissible as records of a regularly conducted activity

pursuant to Fed.R.Evid. 806(6), the hearsay statements that they contain must also be admissible under an exception to the hearsay rule. Fed.R.Evid. 805. However, neither these statements nor the statements in the letters of complaint are admissible under any of the hearsay rule exceptions.

Plaintiffs argue that the statements are admissible under the present sense impression exception that allows into evidence a statement describing a condition, made while the declarant was perceiving the condition or immediately thereafter. Plaintiffs urge a liberal interpretation of the word "immediately," arguing that not sufficient time had elapsed for complainants to develop a motive to fabricate. However, other courts that have considered the requirement of immediacy have strictly construed it unless there were circumstances substantiating the statement's trustworthiness. *See, United States v. Blakey,* 607 F.2d 779 (7th Cir.1979) (statement recorded between several minutes and 23 minutes after declarant's observation of event admissible under Fed.R.Evid. 803(1) where substantial circumstantial evidence corroborated statement's accuracy), *United States v. Cain,* 587 F.2d 678 (5th Cir.), *cert. denied,* 440 U.S. 975, 99 S.Ct. 1543, 59 L.Ed.2d 793 (1979) (statement of CB'er that could not have been made immediately after his observance of defendants because defendants had walked five miles past him at time of statement, inadmissible under Fed.R.Evid. 803(1)), *Hilyer v. Howat Concrete Co.,* 578 F.2d 422 (D.C.Cir.1978) (statement made 15–45 minutes after accident did not qualify as "immediately" after accident under Fed.R.Evid. 803(1)).

It is unlikely that the statements at issue here were made immediately after the complainants suffered from their alleged symptoms. Furthermore, the reliability of present sense impressions is based partially upon the fact that the statement is usually made to a person in a position to observe the event or condition and to check misstatements. 4 Weinstein's Evidence ¶ 803(1)[1] (1981). In the present case, statements by complainants were made

over the telephone or by letter to defendants' employees who had no opportunity to observe the complainant's condition and to check misstatements.

 The other type of evidence of TSS occurrences sought to be introduced by plaintiffs consists of CDC reports of TSS cases. Plaintiffs' papers submitted in opposition to this motion do not make clear exactly what is in these reports. It is impossible to determine whether they would be admissible without knowing how, when and by whom they were prepared and what information they contain.

Defendants' motion to exclude evidence in the form of consumer complaints of occurrences of TSS other than those of Stacy Wolf is granted. The court will entertain and rule upon objections to any other form of evidence of other TSS occurrences at such time as plaintiff attempts to introduce it.

IV. *Injuries Other Than TSS*

Defendants seek to exclude evidence of non-TSS injuries associated with the use of Rely. This evidence consists of consumer complaints, compilations of the complaints, and evidence of defendants' follow-up procedures concerning the complaints. Plaintiffs argue that such evidence is admissible to show defendants' knowledge of "problems" with Rely and to show a habit and routine practice of defendants evincing a reckless disregard for the public's health and safety.

 Where evidence of other acts and occurrences are offered to prove product defect, negligence, or causation, courts generally require that the circumstances surrounding the other occurrences be substantially similar to those in the case at bar. *Prashker v. Beech Aircraft Corp.,* 258 F.2d 602 (3d Cir.), *cert. denied,* 358 U.S. 910, 79 S.Ct. 236, 3 L.Ed.2d 230 (1958), *McKinnon v. Skil Corp.,* 638 F.2d 270 (1st Cir.1981), *Ra-*

*mos v. Liberty Mutual Insurance Co.,* 615 F.2d 334 (5th Cir.1980), *cert. denied,* 449 U.S. 1112, 101 S.Ct. 921, 66 L.Ed.2d 840 (1981). The evidence sought to be introduced consists of complaints of rashes, allergic reactions, blackouts and weakness, vaginitis, infection, irritation, burning, disintegration of the tampon causing infection, severe cramping, abdominal pains, and ulcerations and lacerations caused by the tampon and the inserter. The symptoms of TSS, taken from the case definition formulated by the CDC consist of (1) fever; (2) rash; (3) desquamation of palms and soles; (4) hypotension; (5) involvement of three or more of the following organ systems: gastrointestinal, muscular, mucous membrane, renal, hepatic, hematologic, and central nervous system; and (6) negative results on the following tests, if obtained: blood, throat, or cerebrospinal fluid cultures, and serologic test for Rocky Mountain spotted fever, leptosirosis, or measles. I find no substantial similarity between the injuries alleged in the complaints sought to be introduced and the injury at issue in this case, namely TSS. Therefore, this evidence would not be admissible to establish product defect, negligence or causation.

 Plaintiffs contend that the evidence is admissible for the purpose of showing notice. The Third Circuit has held that where evidence of other accidents and occurrences is offered to prove defendant's notice of the dangerous situation that caused plaintiff's harm, the strictness of the requirement of similarity of conditions may be relaxed. *Evans v. Pennsylvania Railroad Company,* 255 F.2d 205, 210 (3d Cir. 1958). Even if similarity of circumstances is established, the admissibility of the evidence lies within the discretion of the trial judge who must apply the balancing required by Fed.R.Evid. 403.[3] *Gardner v. Southern Railway Systems,* 675 F.2d 949 (7th Cir.1982), *McKinnon, supra* at 277.

---

**3.** Fed.R.Evid. 403 provides:

 Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice,

confusion of the issues, or misleading of the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

■ I fail to see the similarity of circumstances, even under a relaxed standard, between most of the injuries complained of and TSS. Complaints of rashes, allergic reactions, vaginitis, irritation, burning, disintegration of the tampon, ulcerations, and lacerations would not serve to put defendants on notice of a defect in their product such as to cause the complex illness that is the subject of this litigation. Plaintiffs point to two particular complaints in which the symptoms alleged were very similar to TSS. However, I am of the opinion that complaints of a few women, out of what must have been thousands of Rely users, that they suffered these symptoms coincidental with their use of Rely, are not very probative of the fact that defendants were put on notice of the defect at issue in this case.

I find that the probative value of this evidence is substantially outweighed by the dangers of unfair prejudice, confusion of the issues and the considerations of delay and waste of time.

Unfair prejudice in the context of Fed.R. Evid. 403 means "an undue tendency to suggest decision on an improper basis . . . ." Fed.R.Evid. 403 advisory committee note. Here, the tendency would be for the jury to consider the evidence as proof of product defect, negligence, or causation[4] and not as proof of notice.

There is also the danger that in considering these other complaints, the jury might confuse the issues in the case and lose sight of the actual injury being litigated.

I have also considered the amount of time that would be spent answering the many questions raised by this evidence such as how many complaints there were relative to the number of Rely users, how many complaints were similar enough to that of Stacy Wolf to constitute notice of TSS, and whether the complaints contained sufficient background information regarding the user's physical condition and manner of use of Rely. A detailed analysis would have to be made of each complaint in order to determine whether the facts were similar enough to Stacy Wolf's complaint to constitute notice to defendants of the particular problem with Rely that is the subject of this litigation.

For the above reasons, defendants' motion to exclude evidence of non-TSS injuries is granted.

## V. Withdrawal of Rely from the Market

Defendants have moved to exclude evidence of Rely's withdrawal from the market to prove product defect, negligence, causation, impeachment, or punitive damages. They seek to have such evidence introduced as factual background only and request that the jury be instructed not to draw any inference of product defect or causation from the fact of withdrawal.

Pursuant to Fed.R.Evid. 104(a), a threshold issue which must be determined is whether defendants' withdrawal of Rely from the market was voluntary and therefore entitled to the protection that Fed.R. Evid. 407[5] gives to subsequent remedial measures.

Defendants claim that they voluntarily withdrew Rely from the market shortly after learning of the results of studies which indicated a higher statistical association of TSS with Rely than with any other brand of tampon. Plaintiffs argue that far from being voluntary, defendants' withdrawal of Rely was forced upon them by the Food and Drug Administration (hereinafter "FDA")

---

**4.** As pointed out previously, there is insufficient similarity of circumstances to admit the evidence for this purpose. In addition, the evidence suffers from the same hearsay dangers inherent in the complaints of other occurrences of TSS, discussed *supra.*

**5.** Fed.R.Evid. 407 provides:

When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment.

which was about to take legal action against them.

The evidence presented by both parties, supports a finding that defendants' action was voluntary.

Although a memo of a September 12, 1980 meeting of the FDA indicates that Commissioner Goyan and several members agreed that defendants should be made to recall Rely, there is no evidence that defendants knew of this proposed action. Plaintiffs argue that defendants had to have known of this as early as September 16, 1980 and point to a statement made by the Commissioner which revealed that the FDA met with defendants on that date. However, the Commissioner merely stated that the FDA and defendants met to discuss the CDC statistics and nowhere indicated that the FDA had made any threats against defendants or had in any way coerced them to withdraw Rely from the market. To the contrary, the Commissioner stated that "P & G, on its own initiative, announced it was withdrawing Rely from the market...."

On September 26, 1980, defendants entered into a Consent Agreement with the FDA providing for a notification and retrieval program. Plaintiffs cite paragraphs four and five of this agreement as proof that defendants withdrew Rely under compulsion. Those paragraphs state that on September 23, 1980, the FDA advised defendants that it was "contemplating the possibility" of compelling them to engage in a notification and retrieval/refund program and that in settlement of such contemplated action, the FDA and defendants entered into the agreement. The quoted language does not lead to the conclusion that defendants were acting under the threat of concrete action when they decided to withdraw Rely. Furthermore, as plaintiffs themselves point out, defendants notified the FDA on September 22, 1980, of their intention to withdraw Rely and were not advised by the FDA of the possibility of action against them until September 23, 1980. While plaintiffs characterize this as defendants' staying "one step ahead of the law," I find no evidence leading to the conclusion that defendants withdrawal of Rely was not voluntary, especially in light of the FDA's repeated assertions that defendants voluntarily withdrew Rely from the market. (*See* FDA Brochure, Defendants' Brief Exhibit 7; Letter to *Wall Street Journal,* Defendants' Brief Exhibit 8; Statement of Commissioner Goyan, Plaintiffs' Brief Exhibit D).

▮ I find that defendants' withdrawal of Rely from the market was voluntary and constituted a subsequent remedial measure. Its admissibility is therefore controlled by Fed.R.Evid. 407.

This rule clearly bars the admission of evidence of subsequent remedial measures to prove negligence or culpable conduct. Courts have split over the issue of whether the rule should be applied to strict liability actions. *Compare Farner v. Paccar, Inc.,* 562 F.2d 518 (8th Cir.1977) and *Robbins v. Farmers Union Grain Terminal Ass'n.,* 552 F.2d 788 (8th Cir.1977) (holding that Fed.R. Evid. 407 does not apply to actions based on strict liability) with *Cann v. Ford Motor Co.,* 658 F.2d 54 (2d Cir.1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 2036, 72 L.Ed.2d 484 (1982). *Oberst v. International Harvester Co.,* 640 F.2d 863 (7th Cir.1980), *Werner v. Upjohn Co.,* 628 F.2d 848 (4th Cir. 1980), *cert. denied,* 449 U.S. 1080, 101 S.Ct. 862, 66 L.Ed.2d 804 (1981), and *Bauman v. Volkswagenwerk Aktiengesellschaft,* 621 F.2d 230 (6th Cir.1980) (holding that Fed.R. Evid. 407 applies to actions based on strict liability). The Third Circuit has adopted the latter view and holds that the rule applies to strict products liability actions. *Josephs v. Harris Corp.,* 677 F.2d 985, 991 (3d Cir.1982), *Knight v. Otis Elevator Co.,* 596 F.2d 84 (3d Cir.1979). This view is based upon the belief that the policy behind the rule is equally well served by its application to products liability actions. The position was stated by the Court in *Werner v. Upjohn Co., supra:*

> The rationale behind Rule 407 is that people in general would be less likely to take subsequent remedial measures if their repairs or improvements would be

used against them in a lawsuit arising out of a prior accident. By excluding this evidence defendants are encouraged to make such improvements. It is difficult to understand why this policy should apply any differently where the complaint is based on strict liability as well as negligence. From a defendant's point of view it is the fact that the evidence may be used against him which will inhibit subsequent repairs or improvement. It makes no difference to the defendant on what theory the evidence is admitted; his inclination to make subsequent improvements will be similarly repressed. 628 F.2d at 857.

The Court also noted that the exceptions listed in the rule dealt with situations where the defendant attempts to make offensive use of the exclusion (e.g., denying ownership or control, contending that no remedial measure was possible or making statements conflicting with the fact of the subsequent remedial measure) and pointed out that any new exceptions should follow this rationale in order to protect the policy behind the rule. *Id.*

To allow evidence of defendants' withdrawal from the market of Rely in order to prove product defect or causation would certainly thwart the policy behind the rule. The probative value of the evidence for the above purposes is marginal at best. In addition, the need for this evidence is weakened since plaintiffs have indicated their intention to introduce other relevant evidence to establish product defect and causation.

Plaintiffs contend that they may use the evidence of withdrawal to impeach defendants by showing that the withdrawal was involuntary and that defendants were not concerned with the public's interest. However, the fact of withdrawal by itself is not relevant to whether that withdrawal was or was not voluntary. Furthermore, as previously stated, I find that defendants' withdrawal of Rely from the market was voluntary.

 Plaintiffs additionally argue that this evidence is admissible to impeach de-

fendants' contention that Rely was safe when, plaintiffs allege, it was withdrawn because it was unsafe. However, the inferences of product defect and of defendants' negligence in marketing such a defective product are exactly the kind of inferences that Fed.R.Evid. 407 is designed to avoid. *See* 2 Weinstein's Evidence ¶ 407[05], pp. 407–26 (1981). *Kenny v. Southeastern Pennsylvania Transportation Authority,* 581 F.2d 351 (3d Cir.1978) *cert. denied,* 439 U.S. 1073, 99 S.Ct. 845, 59 L.Ed.2d 39 (1979), cited by plaintiffs, offers them no support. In that case evidence was admitted that new lighting fixtures were installed to replace old inoperative fixtures several days after plaintiff had been attacked on a darkened station platform. The Court stated:

> In this case, the evidence did not show that a protective device of a nature not previously utilized was subsequently installed, but rather established the need for replacement of that which had previously been employed. As such, the testimony bore directly on the inference that since the lighting was checked on a daily basis, it was adequate at the time the incident occurred. The installation of a new fixture suggested that more than new light bulbs were necessary to maintain the level of lighting that apparently had once existed at the station. 581 F.2d at 356.

In the case at bar, defendants' withdrawal of Rely constituted the previously unutilized protective device contemplated by the *Kenny* Court and therefore comes under the protection of Fed.R.Evid. 407.

Defendants' motion to exclude evidence of withdrawal of Rely tampons from the market to prove product defect, negligence, causation or impeachment on the issues of safety or damages is granted.

## VI. *Case Control Studies*

Defendants seek to exclude from evidence case control studies regarding TSS conducted by the CDC and state health departments, to exclude reference to the studies at trial, and to prevent plaintiffs'

experts from basing their testimony on the studies. Alternatively, defendants request that a hearing be held on the first day of trial and that plaintiffs be required to present evidence regarding each study to which they propose to refer.

Defendants argue that the studies are not admissible as a public record or report or as a learned treatise, may not form the basis for expert testimony, and should be excluded because their relevance is substantially outweighed by the potential for prejudice and waste of time.

Fed.R.Evid. 803(8)(C) excepts from the hearsay rule:

> (8) Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth ... (C) in civil actions and proceedings and against the Government in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

Defendants object to the introduction of the studies under the above rule on several grounds.

Their first argument is that the studies, based upon diagnostic opinion, do not constitute "factual findings". While there is a conflict of authority as to whether public records or reports containing opinions and evaluations are admissible under the above rule, the Third Circuit has held such reports and records admissible. *See Melville v. American Home Assurance Co.,* 584 F.2d 1306, 1316 (3d Cir.1978), *Lloyd v. American Export Lines, Inc.,* 580 F.2d 1179, 1183 (3d Cir.), *cert. denied,* 439 U.S. 969, 99 S.Ct. 461, 58 L.Ed.2d 428 (1978).

Defendants next argue that there is a requirement that declarant have firsthand knowledge of the matter asserted and that the studies do not meet this requirement because they are based upon multiple levels of hearsay. It has generally been held that Rule 803(8)(C) does not require that the author of a report have first-hand knowledge of the facts upon which his findings are based. *Baker v. Elcona Home Corp.,* 588 F.2d 551, 557–58 (6th Cir.1978), *cert. denied,* 441 U.S. 933, 99 S.Ct. 2054, 60 L.Ed.2d 661 (1979). *United States v. Smith,* 521 F.2d 957, 968 n. 24 (D.C.Cir.1975), *Zenith Radio Corp. v. Matsushita Electric Industrial Co.,* 505 F.Supp. 1125, 1148 (E.D.Pa. 1980), *United States v. American Telephone & Telegraph Co.,* 498 F.Supp. 353, 364 (D.D. C.1980).

Defendants' third argument is that the evidence is not trustworthy and therefore must be excluded. Rule 803(8)(C) assumes the admissibility of public documents and the burden is on the objector to show the lack of trustworthiness. Fed.R. Evid. 803(8)(C) advisory committee note, *Baker, supra* at 558, *Zenith, supra* at 1146. Defendants assert that the research for the studies was hastily conducted and suffered from serious methodological flaws. However, these considerations bear on the weight to be given the evidence by the jury rather than on its admissibility. *Cf. Bean v. United States,* 533 F.Supp. 567, 578–79 (D.Colo.1980). I find that these studies, conducted by public health agencies, are trustworthy. As the Fifth Circuit observed, "[t]he motivation for accuracy in a record prepared by a public health official concerning outbreaks of serious disease within an area committed to his charge is obvious. A brand of expertise sufficient to insure accuracy may be assumed...." *Reyes v. Wyeth Laboratories,* 498 F.2d 1264, 1288 (5th Cir.), *cert. denied,* 419 U.S. 1096, 95 S.Ct. 687, 42 L.Ed.2d 688 (1974). I also find persuasive that all of the studies show an association between tampon use and TSS. Furthermore, the fact that these studies were published in respected journals is another indication of their trustworthiness.

For the above reasons, I find that the studies conducted by the CDC and state health departments come under the public records exception to the hearsay rule as set forth in Fed.R.Evid. 803(8)(C).

Defendants argue that even if excepted from the hearsay rule, the studies should be excluded under Fed.R.Evid. 403 because their probative value is substantial-

626

ly outweighed by the dangers of unfair prejudice, confusion of the issues and misleading the jury. As support for this argument, defendants reiterate their contentions that the studies were not trustworthy and were based on multiple levels of hearsay and diagnostic judgments. Having previously disposed of these contentions, I find that the studies are highly probative of causation and their probative value is not substantially outweighed by the dangers of prejudice, confusion, misleading the jury or waste of time.

I therefore hold the case control studies conducted by the CDC and state health departments admissible into evidence. Furthermore, plaintiffs' experts may refer to and may base their testimony upon these studies.

I see no need for the hearing requested by defendants. This precise question was litigated in two previous cases involving Rely tampons and both courts admitted the studies and allowed expert testimony based upon them. *Kehm v. Procter & Gamble Co.*, Civ. No. C 80–119 (N.D.Iowa June 29, 1982), *Lampshire v. Procter & Gamble Co.*, Civ. No. 80–F–167 (D.Colo. March 8, 1981).

Defendants' motion to exclude these studies, any reference to them, and any expert testimony based upon them is denied. Defendants' motion for a hearing on this matter to be held on the first day of trial is also denied.

VII. *In-Court Experiments*

Defendants have moved to preclude the performance of in-court experiments by plaintiffs' experts. In particular, defendants refer to a demonstration performed by Dr. Phillip Tierno as part of his testimony in *Kehm v. Procter & Gamble, supra* in which an enzyme was added to a component of Rely tampons to show the liquification of the component into glucose.

Defendants object to this demonstration on the following grounds: (1) it would not be performed under conditions substantially similar to conditions found in the human vagina and (2) its probative value would be substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury. Plaintiffs argue that the demonstration is highly probative of Dr. Tierno's theory that a component of Rely is capable of being broken down by enzymes naturally found in the vagina.

Experimental evidence is admissible if relevant and probative. *Glick v. White Motor Company*, 458 F.2d 1287, 1294 (3d Cir.1972). The probative value of such evidence depends upon whether the conditions of the experiment are identical with or similar to the actual conditions in question. *Id.* at 1294. The trial court has discretion in measuring the degree of similarity and so long as there are valid points of similarity, the evidence is admissible. *Lever Bros. Co. v. Atlas Assur. Co.*, 131 F.2d 770, 777 (7th Cir.1942). The differences in conditions go only to the weight of the evidence. *Hopkins v. E.I. DuPont De Nemours & Co.*, 199 F.2d 930, 934 (3d Cir.1952), *Lever Bros. Co., supra.*

The experiment performed during the course of the *Kehm* trial and described by Chief Judge McManus, *Kehm, supra*, consisted of adding an enzyme, Betaglucosidase, to carboxymethyl-cellulose (CLD) chips taken from a Rely tampon with the intended result being the liquification of the chips into glucose. The experiment was intended to illustrate Dr. Tierno's theory that the staph infection associated with TSS is caused by the glucose acting as food for staph aureus bacteria. This results in increased production of staph aureus toxins which in turn combine with other factors to cause TSS.

Judge McManus found, and I agree, that the experiment was highly relevant to plaintiffs' theory of causation. The basic purpose of the experiment is to demonstrate that CLD is capable of being broken down when exposed to an enzyme found in the vagina. These ingredients are present in both the experimental condition and the actual condition. While there are differences in the conditions, some of these differences will be obvious to the jury and

others will be developed, as in *Kehm,* during examination of plaintiffs' expert.

I find that the evidence will not cause undue prejudice or confusion of the issues. Defendants refer to the case of *Raymond v. Riegel Textile Corp.,* 484 F.2d 1025 (1st Cir.1973) in which the Court indicated that it might have been error for the trial court to allow a demonstration of burning fabric before a jury in a case involving burn injuries to a 12-year old child. However, the performance of the experiment at issue here will not have the same kind of emotional impact upon the jury that the evidence in *Raymond* would have had. Nor do I believe that the jury will be confused or misled by the experiment. As previously stated, any difference in conditions will be obvious or else brought to light during examination of plaintiffs' witness and more properly goes to the weight to be given to the evidence than to its admissibility.

Defendants' motion to preclude the performance of the in-Court experiment herein described is denied.

## VIII. *Intervention*

A motion to intervene pursuant to Fed.R. Civ.P. 24(b) has been brought by some 20 persons, all named plaintiffs in 13 separate actions against defendants pending in nine different federal district courts and three state courts. These plaintiffs seek to intervene for the limited purpose of determining the fact of defendants' liability to them. More specifically, their brief states that they wish to intervene for the purpose of determining their right to compensatory and/or punitive damages against defendants excluding the issues of individual causation and damages, which issues will be litigated in the courts in which they brought their original actions.

Fed.R.Civ.P. 24(b) provides in pertinent part:

Upon timely application anyone may be permitted to intervene in an action: ... (2) when an applicant's claim or defense and the main action have a question of law or fact in common .... In exercising its discretion the court shall consider

whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

In determining whether to permit intervention pursuant to the above rule, the court must first decide whether the main claim and the applicant's claim have a common question of law or fact. *Stallworth v. Mansanto Co.,* 558 F.2d 257, 269 (5th Cir. 1977). Even if the court does find a common issue of law or fact, it may, in the exercise of its sound discretion, deny permissive intervention. *Grogan v. American Brands, Inc.,* 70 F.R.D. 579, 584 (1976), *Rockford v. Secretary of Housing and Urban Development,* 69 F.R.D. 363, 366 (1975).

Intervenors argue that they share a common question of law with plaintiffs in the present case. However, I disagree.

The law applicable to the case at bar is the law of New Jersey. It is this law that will determine whether defendants are liable under a theory of strict liability, whether punitive damages are available to plaintiffs under such a theory, what standards must be applied in determining entitlement to punitive damages, and what defenses are available to defendants. None of the claims brought by the intervenors is governed by New Jersey law. These claims have been brought in federal and state courts in Florida, North Carolina, Wisconsin, Connecticut, Pennsylvania, Montana, Arizona, Utah, Washington, South Dakota, and California and are governed by the laws of those states. I therefore find no question of law common to these claims and the claims of plaintiffs in the case at bar.

Intervenors next argue that a common factual question exists as to whether a component of Rely tampons can be broken down into a substance that promotes the growth of the bacteria that cause TSS. However, the issue of causation must be individually litigated, as intervenors concede. When that issue is removed from the above formulation, a very narrow question of fact remains. The purpose of permissive intervention is to avoid a multiplicity of suits by settling related controversies in a

**628**

single action. Fed.Proc., L.Ed. § 59–333 (1981). This purpose would be poorly served by granting the current motion since extensive issues, legal and factual, would remain to be litigated in the intervenors' original forums. While the delay resulting from intervention might be minimal, so would the conservation of judicial resources.

Twice before, intervenors attempted to consolidate these proceedings. Both attempts failed. This application is simply one more effort by intervenors to get into court through the back door. However, they each have an adequate remedy in the form of an already pending action in the original forum, therefore permissive intervention may be denied. *See Korioth v. Briscoe,* 523 F.2d 1271, 1279 (5th Cir.1975), *Illinois v. Bristol-Myers Co.,* 470 F.2d 1276, 1279 (D.C.Cir.1972). Although there may be a very narrow common factual question, in the exercise of my discretion, I deny leave to intervene.

Attorney for defendants shall submit an appropriate order within five (5) days.